Judy J. JONES, Appellee,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Appellant.

United States of America, Intervenor.

No. 97–7186.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1998.

Decided March 17, 2000.

Bruce P. Heppen argued the cause for the appellant. Robert L. Polk and Robert J. Kniaz were on brief. Gerard J. Stief entered an appearance.

Douglas B. Huron argued the cause for the appellee. Richard A. Salzman was on brief.

Seth M. Galanter, Attorney, United States Department of Justice, argued the cause for the intervenor. Bill Lann Lee, Acting Assistant Attorney General, United States Department of Justice, was on brief.

Before: SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The Washington Metropolitan Area Transit Authority (WMATA) appeals judgments rendered against it in a suit brought by Judy J. Jones alleging discriminatory and retaliatory refusal to promote, discharge and failure to reinstate in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The district court awarded Jones compensatory and liquidated damages under the ADEA, pur-

suant to a jury verdict, and reinstatement, back pay (including prejudgment interest) and retroactive promotion under Title VII. In addition, the court awarded attorney's fees and injunctive relief under each statute. WMATA challenges the both the ADEA and the Title VII judgments. We vacate the ADEA damage award because WMATA is immune from liability therefor under the Eleventh Amendment to the United States Constitution. We affirm the Title VII award *in toto*.

## I.

Jones began working for WMATA as a bus driver in 1974 and in 1984 rose to the position of first-line TS–3 rail operations supervisor (TS–3) in WMATA's Department of Rail Service (Department). This dispute began on June 18, 1985 when Jones and four subordinates wrote a letter to Fady Bassily, WMATA assistant general manager in charge of the Department, complaining of employment discrimination against "white women." Joint Appendix (JA) 254. At Bassily's direction, Mark Miller, then his general deputy, and John Kirin, the Department's third ranking employee, met with Jones on August 6, 1985. According to Jones, during their meeting Miller told her that her job was "in jeopardy" and asked her to resign. JA 400.

In 1986 the Department promoted several other TS–3 supervisors to a newly created TS–4 position. According to WMATA personnel records, Jones was "disqualified" from consideration because of a "recent disciplinary action." JA 293.

In January 1987 a screening panel recommended Jones and thirteen other employees for promotion to TS–4. Kirin, who had switched positions with Miller, rejected the panel's list of candidates and asked Miller to draft a new one, taking into account factors he believed the panel had not adequately considered. Jones's name did not appear on Miller's list. In a letter to Jones dated October 30, 1987 Miller

cited as reasons for not recommending her promotion: (1) her "marginal" score on a written exam and (2) her failure to follow WMATA policies and procedure, specifically by "transmit[ting] [her] personal views to [her] subordinates, (when in conflict with those of the Authority)," which he characterized as "unprofessional," and by giving a customer a cash refund from a farecard machine "contrary to station policy." JA 305.[1]

Meanwhile, on September 11, 1987 Jones filed a complaint with the Equal Opportunity Employment Commission (EEOC) alleging unlawful discrimination on the basis of race, age and sex and retaliation.

In September 1988 Jones again applied for a TS–4 position. The panel, headed by Miller, who was aware of Jones's pending EEOC claim, again rejected her despite her high ratings on objective job criteria. At trial, Miller indicated she was not recommended because she did "very, very poorly" during her interview. JA 558.

On March 1, 1989 Jones filed this lawsuit alleging discriminatory and retaliatory failure to promote in violation of Title VII and the ADEA. After her lawyer became ill the lawsuit "stalled" until she retained new counsel in February 1991. *Jones v. WMATA*, 946 F.Supp. 1023, 1029–30 (D.D.C.1996).

On March 6, 1991 Jones was directed to meet with Allen Brown, one of Bassily's deputies, who was investigating a recent employee protest in which Jones had participated. Brown had previously questioned Jackie Rhodes, one of Jones's subordinates, at great length about the protest, pressing for information about Jones's role in it. Familiar with Rhodes's experience, Jones refused to meet Brown without her lawyer and subsequently refused a request from Miller as well to meet in his office. After a confrontation with Miller in the lunch room, Jones called her division superintendent, Al Yor-

---

**1.** Also in 1987 Jones applied unsuccessfully for promotion to a TS–5 position as Quality Assurance Inspector. She claimed below that her rejection resulted from gender discrimination. This claim is not at issue on appeal.

ro, to tell him she was going home sick. Later that afternoon Jones received a call at home from Yorro, directing her to re-port for a medical examination by 6:00 p.m., which she did. Following the exam, Aubrey Burton, General Superintendent of the Department's Rail Transportation office, recommended to Bassily that Jones be fired, after consulting with WMATA's personnel director and its Office of General Counsel. Bassily approved the dis-charge and signed Jones's termination form on March 7, 1991. In a certified letter to Jones, Brown identified as the cause for Jones's discharge "insubordina-tion" in refusing orders to meet with Mil-ler and himself. JA 252–53. After un-successfully requesting reinstatement in a letter to WMATA's Office of General Counsel, Jones amended her complaint to claim retaliatory discharge and failure to reinstate.

On August 6, 1993 the district court granted partial summary judgment in fa-vor of Jones on her claim of retaliatory failure to reinstate in violation of both Title VII and the ADEA. The court re-served "[t]he issue of appropriate relief for this claim" to "be tried together with the remaining claims in this case." JA 74.

The ADEA claims were tried before a jury in October 1994. On October 20, 1994 the jury returned a verdict awarding Jones $50,000 in compensatory damages on the ADEA retaliation claims—$10,000 for the 1988 failure to promote to TS–4 and $20,-000 each for the termination and failure to reinstate in 1991. In addition, the jury found that the ADEA violations were will-ful. Accordingly, the district court imme-diately entered a judgment on the verdict in the amount of $50,000.

In an opinion and order filed October 15, 1996 the court also found for Jones on

three of her Title VII claims: retaliatory failure to promote both in 1987 (in retalia-tion for signing the 1985 letter complaining of discrimination) and in 1988 (for filing the 1987 EEOC complaint) and retaliatory discharge in 1991 (for filing and prosecut-ing the Title VII lawsuit).[2] At the same time, in accord with its own findings and with the jury's, the court entered a final judgment ordering the following relief: (1) reinstatement and retroactive promotion to TS–4 effective October 1, 1987 under both the ADEA and Title VII; (2) back pay under Title VII (consisting of the differ-ence between what Jones was actually paid after October 1, 1987 and what she would have been paid at the TS–4 level) plus prejudgment interest; (3) liquidated dam-ages under the ADEA, 29 U.S.C. § 626(b) (equal to the back pay owed after Febru-ary 2, 1989, the date the jury found Jones was "willfully" deprived of the TS–4 pro-motion); (4) a permanent injunction pro-hibiting WMATA "from taking any form of retaliatory action against Jones for engag-ing in activity protected by Title VII or the ADEA"; and (5) "reasonable" expenses and attorney's fees. 946 F.Supp. at 1032–34.

## II.

WMATA has challenged the district court's judgments on various grounds but, in light of the posture of the case and of our disposition, we need address only three of them. We discuss each separate-ly.

### A. *Sovereign Immunity*

We first consider WMATA's contention that state entities (including WMATA) are immune under the Eleventh Amendment from ADEA liability. Because the United States Supreme Court recently resolved this question in favor of immunity,[3] we

**2.** The court decided the Title VII claims, based on evidence presented in a short bench trial as well as the evidence submitted both during and before the jury trial, because the acts giving rise to Jones's claims occurred before the effective date of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(c), which first

authorized jury trials for such claims. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

**3.** After oral argument we ordered this appeal held in abeyance pending the Supreme Court's decision in *Kimel v. Florida Bd. of*

**432**

agree that the ADEA damages awards must be vacated.

 Under the Eleventh Amendment, " 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.' " *Morris v. WMATA,* 781 F.2d 218, 222–23 (D.C.Cir.1986) (quoting *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Moreover, though the immunity is that of the state, 'some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.' " *Id.* at 223 (quoting *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)). WMATA was created by a compact enacted by the Congress and to which the Commonwealth of Virginia, the State of Maryland and the District of Columbia are signatories. We have consistently recognized that in signing the WMATA Compact, Virginia and Maryland each conferred its immunity upon WMATA, which therefore enjoys, to the same extent as each state, immunity from suit in federal court based on its performance of governmental functions.[4] *See, e.g., Morris v. WMATA, supra; Souders v. WMATA,* 48 F.3d 546, 548 (D.C.Cir.1995); *Beebe v. WMATA,* 129 F.3d 1283, 1287 (D.C.Cir. 1997); *see also Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 52, 50 n. 20, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (not-

ing "decision in *Morris* is compatible with our approach" to determining multi-state authority's Eleventh Amendment immunity *vel non*). We have also held that WMATA's "governmental function" immunity encompasses "the hiring, training, and supervision of WMATA personnel," which is the kind of conduct for which Jones seeks to hold WMATA liable under the ADEA. *See Burkhart v. WMATA,* 112 F.3d 1207, 1217 (D.C.Cir.1997); *accord Beebe v. WMATA, supra.* The determinative question therefore is whether, as Jones has argued, in enacting the ADEA the Congress abrogated the states' (and consequently WMATA's) Eleventh Amendment immunity from ADEA liability. Since oral argument, the United States Supreme Court has definitively answered this question in the negative. In *Kimel v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), the Court held that, although the ADEA contains a statement of congressional intent to abrogate the states' Eleventh Amendment immunity, the attempted abrogation exceeds the Congress's authority under § 5 of the Fourteenth Amendment. Under *Kimel,* therefore, we conclude the ADEA award of compensatory and liquidated damages against WMATA must be vacated because its "practical result ... would be payment from the treasuries of Maryland and Virginia." *Morris,* 781 F.2d at 225.[5]

### B. Title VII Judgment

██ We next address WMATA's challenge to the district court's Title VII judg-

---

*Regents,* which issued on January 11, 2000 and which we discuss *infra.*

4. The WMATA Compact provides:
The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.
WMATA Compact, Pub.L. No. 89–774, § 80, 80 Stat. 1324, 1350 (1966).

5. Because we vacate the ADEA awards based on the jury's verdict, we need not address WMATA's objections to the admissibility of certain evidence (namely evidence of the entry of partial summary judgment, of the discrimination judgment against WMATA in *Townsend v. WMATA,* 746 F.Supp. 178 (D.D.C.1990), and of WMATA's alleged discrimination against several witnesses), or its challenges to the court's failure to instruct the jury that Jones was not entitled to have her lawyer present during attempted interviews preceding her discharge and that as a supervisor Jones did not engage in protected activity when she signed the 1985 letter to Bassily.

ment. WMATA contends that the evidence does not support the court's findings that WMATA unlawfully retaliated against Jones in 1987 and in 1988 when it failed to promote her and in 1991 when it discharged her.[6] We must uphold the district court's factual findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *see also Pullman–Standard v. Swint*, 456 U.S. 273, 290, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). We perceive no clear error here.

■■■ Under the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Jones was required first to establish a prima facie case of retaliation by demonstrating that "(1) [she] engaged in protected activity, (2) [she] was subjected to adverse action by the employer and (3) there existed a causal link between the adverse action and the protected activity." *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 202 (D.C.Cir. 1997) (citing *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985)). Such a showing raises a "rebuttable presumption of unlawful discrimination" and shifts to the defendant the burden to "rebut the presumption by asserting a legitimate, non-discriminatory reason for its actions." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the defendant meets this burden of production, "the presumption of discrimination dissolves" and the plaintiff assumes the burden "to persuade the trier of fact that the defendant's proffered reason was not the actual or sole basis for the disputed action." *Id.*

On the 1987 promotion claim, WMATA does not dispute that Jones established a *prima facie* case, as the district court

found, but does contend that Jones failed to rebut as pretextual WMATA's proffered legitimate reasons for not promoting Jones. We conclude the evidence supports the district court's finding of pretext. Of the three reasons Miller offered in his October 30, 1987 letter for not promoting Jones, the district court reasonably rejected as pretextual two: Jones's "marginal" test score, because it was higher than the score of another employee who *was* promoted, and the instance when she gave a cash refund to a customer, because the court found her action consistent both with the Metrorail Handbook and with a Department directive. 946 F.Supp. at 1028. In contrast, the court accepted Miller's third reason, that Jones had "transmit[ted] [her] personal views to [her] subordinates," as "more plausible—but violative of Title VII" because it reflected retaliation for protected activity, namely, the 1985 letter to Bassily complaining of Department discrimination. Because the court's findings of pretext and of retaliation as to the promotion claim are supported by the evidence, they are not clearly erroneous.

■ We also reject WMATA's contention that there is no record evidence that those responsible for firing Jones were aware she had hired new counsel in January 1991, thereby reinvigorating her dormant lawsuit and prompting a retaliatory discharge. *See* JA 138–39. In its opinion denying WMATA's post-trial motion for judgment as a matter of law, the district court noted the undisputed fact that Department members, including Bassily, knew that the lawsuit was pending and that WMATA's Office of General Counsel

---

**6.** Although the court expressly made the latter two findings "in reliance upon the verdict of the jury on Jones' ADEA claim," in each case the court also "note[d] that it would have reached the same conclusion independent of the jury, based upon the filings and oral argument of counsel, and the testimony and other evidence in the record." 946 F.Supp. at 1029, 1030. On the 1987 promotion claim, the court "ma[de] its findings under Title VII independent of the jury's determinations un-

der the ADEA." *Id.* at 1028. On Jones's claim of failure to reinstate, we need not resolve WMATA's challenge to the district court's summary judgment since the only relief it supports—reinstatement and back pay— would have been awarded in any event under the court's wrongful discharge finding, which we uphold and which the district court made clear "would be the same even in the absence of the summary judgment determination." 946 F.Supp. at 1030.

was aware she had retained new counsel who had successfully had the suit restored to the court's active docket. *Jones v. WMATA*, 946 F.Supp. 1011, 1022 (D.D.C. 1996); *see also* JA 581–87. Further, Rhodes testified that Brown asked her about Jones's lawyers when he questioned her one week before the firing, JA 477, and Bassily testified that before recommending Jones's discharge Burton consulted with WMATA's Office of General Counsel, which "concurred" in the dismissal. JA 628. This evidence supports the court's finding that WMATA decision makers fired Jones with knowledge she had retained new counsel.

■ Finally, it was not clearly erroneous for the court to find pretextual WMATA's claim it fired Jones for "insubordination" in violation of Department procedure, namely for refusing orders to meet with Brown and Miller. As evidence of pretext, the court cited Jones's willingness to meet with Yorro, WMATA's own violation of its procedures in firing her without affording her an opportunity to explain her behavior and other instances of unlawful retaliation by Department management, both against Jones in connection with her 1987 and 1988 promotion denials and against other employees who had complained of discrimination, *see* 946 F.Supp. at 1026. This evidence suffices.

## C. Prejudgment Interest

■ Finally, WMATA claims Eleventh Amendment immunity from the court's award of prejudgment interest on the back pay award. Relying on *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), WMATA maintains that, because Title VII does not expressly waive the states' immunity from prejudgment interest, they retain their Eleventh Amendment immunity from such awards. WMATA's reliance is misplaced. In *Shaw* the Supreme Court held that the "no-interest rule," under which

interest can be awarded against the United States only pursuant to an express waiver of immunity *from interest*, forecloses recovery of an enhanced attorney fee award in a Title VII action against the United States.[7] The Court has since made clear that abrogation of the states' Eleventh Amendment immunity does not require the same level of specificity. In *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Court held that the Eleventh Amendment does not bar enhancement of an attorney's fees award against states under 42 U.S.C. § 1988 to compensate for delay, noting that *Shaw* had "equated compensation for delay with prejudgment interest." *Id.* at 282 n. 3, 109 S.Ct. 2463. *Shaw's* "observations" about prejudgment interest, the Court explained, "cannot be divorced from the context of the special 'no-interest rule' that was at issue in *Shaw*" and "[t]hat rule, which is applicable to the immunity of the United States and is therefore not at issue here, provides an 'added gloss of strictness' only where the United States' liability for interest is at issue." 491 U.S. at 282 n. 3, 109 S.Ct. 2463 (quoting *Shaw*, 478 U.S. at 318, 106 S.Ct. 2957). Because the no interest rule does not apply to state liability, we see no bar to awarding prejudgment interest on back pay assessed against a state under Title VII, as to which the Congress expressly and effectively abrogated Eleventh Amendment immunity, *see Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), and which has long been recognized, in the absence of immunity, to authorize prejudgment interest as part of its back pay remedy, *see Loeffler v. Frank*, 486 U.S. 549, 557, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988). *Accord Pegues v. Mississippi State Employment Serv.*, 899 F.2d 1449 (5th Cir.1990) ("Congress has the power under section 5 of the Fourteenth Amendment to abrogate the state's immunity to enforce the Amendment's protections. Congress exercised this power in enacting

---

**7.** Since *Shaw* was decided, the Congress has added to Title VII an express waiver of immu-

nity from interest. 42 U.S.C. § 2000e–16(d).

the Civil Rights Act of 1964.") (footnote omitted).[8] We therefore affirm the district court's award of prejudgment interest on the Title VII back pay award.[9]

For the preceding reasons, we vacate the plaintiff's awards of compensatory and liquidated damages under the ADEA and affirm the relief awarded under Title VII—including reinstatement, promotion, back pay, prejudgment interest, injunctive relief and expenses and attorneys fees. Accordingly, we remand for further proceedings consistent with this decision.

*So ordered.*

8. Because we vacate the ADEA liquidated damages award, we need not address WMATA's argument that awarding both liquidated damages and prejudgment interest provides a "double recovery."

9. Jones claims entitlement only to prejudgment interest accruing after November 21, 1991, the effective date of the Civil Rights Act of 1991, *supra* note 6. *See* Appellee's Br. at 36.